E. Nadine **CHRISTIE**, Plaintiff,

v.

**K–MART CORPORATION EMPLOYEES RETIREMENT PENSION PLAN,**
Defendant.

No. 88–4307–C.

United States District Court,
D. Kansas.

Jan. 30, 1992.

Charles R. Hay, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., for plaintiff.

William G. Haynes, Frieden, Haynes & Forbes, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the plaintiff's motion for summary judgment and the defendant's cross-motion for summary judgment. Plaintiff, a former employee with the K–Mart Corporation in Lawrence, Kansas, brings this action to recover disability retirement benefits from the defendant pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* Defendant has denied the plaintiff's benefit application as untimely under the terms of the written plan.

A motion for summary judgment gives the judge an initial opportunity to assess the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2511–12.

An issue of fact is "genuine" if the evidence is significantly probative or more

than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

The movant's initial burden under Fed. R.Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon,* 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon,* 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

For purposes of this motion, the court will accept the following relevant facts as uncontroverted:

1. The plaintiff, E. Nadine Christie ("Christie"), was born on October 29, 1929. She has an eighth grade education. She was an employee of the K–Mart Corporation, at the K–Mart Distribution Center in Lawrence, Kansas, from May 25, 1976, until November 23, 1987, when she was involuntarily separated from the K–Mart Corporation for being off work for one year or more.

2. Christie injured her back on June 10, 1986, while lifting a box at work.[1] She continued to work full time until August 4, 1986. From August 4, 1986, until August 15, 1986, plaintiff worked only 8.4 hours of a possible 80 hours. From August 15, 1986, until her involuntary separation on November 23, 1987, plaintiff did not work and her absence was recorded "Leave of Absence Illness or Injury."

3. In August of 1986, plaintiff began seeing Dr. Kenneth L. Wertzberger, a licensed orthopedic surgeon, for treatment of her injury. Dr. Wertzberger is "the regular company physician" whom K–Mart's Distribution Center personnel "go to." On two occasions, plaintiff tried to return to work, but her pain prevented her from completing the shift. Dr. Wertzberger prescribed physical therapy and strengthening exercises "to see if we can't resume her normal function."

4. At the direction of Dr. Wertzberger, plaintiff received physical therapy from August of 1986 through October of 1987 from Rita Hoffman, a registered physical therapist. The therapy was designed to increase plaintiff's strength gradually to where she could return to work. According to Hoffman, Christie showed some improvement during the early stages of therapy but reached her maximum capacity for work without pain in July of 1987.

5. In his affidavit of December of 1989, Dr. Wertzberger stated that his diagnosis of Christie is degenerative disc disease and spondylolisthesis. He believes that Christ-

---

1. Defendant concedes the authenticity of the exhibit cited by plaintiff in support of this fact. Defendant says the fact is otherwise disputed but offers no citation or exhibit in support of its position. The bald denial of facts in a pleading will not controvert those facts for summary judgment purposes. The court will enforce this rule consistently throughout these proceedings.

ie is permanently disabled and her condition will not improve. He avers that he has held this opinion since June of 1987, for it was then that he noticed that she was no longer making any progress through physical therapy. He believes that Christie is unable "to perform jobs or engage in occupations which would require excessive, or repeated acts of lifting, walking, sitting or standing for long periods, climbing stairs or ladders, bending, stooping, or riding in vehicles."

6. The K–Mart Corporation has an "Employees Retirement Pension Plan ("Plan"). The 1986 version of the Plan, as agreed by the parties, controls the issues of this case. During the relevant times, John E. Dewenter, the Director of Employee Benefits at K–Mart, also served as Plan Administrator by resolution of the K–Mart's Board of Directors.

7. Plaintiff received a copy of the K–Mart Corporation Employee's Retirement Pension Plan Booklet ("Booklet") on June 5, 1986. The first fifteen pages of the Booklet, in its own terms, are a "brief general outline of the principal features and provisions of the Plan." At page five of this general outline, disability retirement benefits are briefly described followed by the direction to "See Section IV, subsection 4" of the Plan. Page five makes no mention of when an application for disability benefits must be filed.

8. Subsection 4 of Section IV of the Plan provides in pertinent part:

An employee who before Normal Retirement Date is retired for total and permanent disability pursuant to *subsection 4 of Section III* shall receive an annual pension to be payable on a monthly basis during the continuance of such disability and beginning as of the first day of the first month after the later of (i) the filing with the Company of an application for a disability satisfactory to the Company for such pension and (ii) at least 6 consecutive months shall have elapsed since the date upon which such disability commenced.

(Emphasis supplied). This provision does not specifically mention a requirement for when an application for disability benefits must be filed.

9. Subsection 4 of Section III of the Plan reads in part:

(a) Any employee covered by the Plan who ceases active employment with an Employer due to a disability which is determined to be total and permanent as provided herein and who, prior to the commencement of the disability, has both attained age 50 and completed 10 years of Service, shall be eligible to make application for a total and permanent disability retirement, provided that such application and medical evidence of total and permanent disability is submitted to the Company within 12 months after the commencement of the disability. A disability shall be deemed to have commenced as of the first day of the continuing absence of the Employee from active employment with an Employer due to such disability. A disability shall be considered total and permanent if a medical examiner satisfactory to the Company certifies that as a result of mental or physical disability such Employee is, and while an Employee became, completely and permanently prevented from engaging in any occupation or employment for wage or profit.

This provision imposes a limitation period for filing an application for disability benefits.

10. When Christie was involuntarily separated from K–Mart, she was not offered another warehouse position because of her qualifications and restrictions.

11. In December of 1987, plaintiff called Gary Spreer, personnel manager for K–Mart Distribution Center in Lawrence, Kansas, about filling out retirement papers for disability retirement. At that time, Spreer did not mention any limitations or conditions for obtaining these benefits. Spreer then called Dewenter's office and related some basic information about Christie's claim to a secretary. Dewenter wrote Spreer in a letter dated December 17, 1987, that Christie was ineligible for benefits as the twelve month period had elapsed since the commencement of her

disability. Spreer then told Christie of the contents of Dewenter's letter.

12. On or about January 21, 1988, plaintiff submitted her application for disability retirement to Spreer. She enclosed two letters from Dr. Wertzberger and one letter from Dr. Roger P. Jackson discussing her physical condition. She alleged on her application that her disability began in July of 1986 with a temporary disability and that she became permanently and totally disabled in June of 1987 because of pain in her back and leg.

13. Defendant responded with a letter from Dewenter dated February 11, 1988, informing Christie that the application was not timely submitted within the terms of Subsection 4 of Section III of the Plan.

14. Plaintiff's attorney then requested by letter dated September 23, 1988, that the Director of Employee Benefits review the denial of plaintiff's claim. Dewenter promptly replied with a letter stating that "we continue to find this individual ineligible for a total and permanent disability pension under terms of the K–Mart Corporation Employees' Retirement Pension Plan." Enclosed in this letter was a copy of the Dewenter's February 11th letter.

15. Plaintiff's attorney then made a written request to appeal the denial of disability benefits. Dewenter again quickly replied with a letter stating that the "Company's position relative to Mrs. Christie's application for a total and permanent disability remains unchanged." Dewenter went on to say that the medical information on file also did not substantiate that plaintiff had a total and permanent disability. Dewenter also enclosed his prior denial letters.

### STANDARD OF REVIEW

Under 29 U.S.C. § 1132(a)(1)(B), plaintiff has the authority to bring this action to recover benefits allegedly due her under the Plan. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1988), the Court held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or the fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

 In relevant part, the K–Mart Plan reads:

The Company shall be solely responsible for the general administration of the Plan and for carrying out the provisions thereof. The Board of Directors of the Company or any person or persons to whom the Board of Directors may <u>delegate such authority</u> may from time to time <u>establish rules</u> for the interpretation, application and administration of the Plan <u>and may determine the interpretation and application of the Plan in particular cases.</u> In making any such determination or rule the Company shall pursue uniform policies and shall not discriminate in favor of or against any Participant or group of Participants.

Any decision of the Company as administrator of the Plan or by its duly authorized representatives with respect to the Plan or any provision thereof may be appealed by the concerned Participant to the Company's Director of Employee Benefits at its Headquarters Offices, 3100 West Big Beaver Road, Troy, Michigan, 48084.

(emphasis added). The underlined portions indicate the Board could delegate the authority to interpret the Plan and to determine the Plan's application. There is nothing in the Plan or in the uncontroverted facts to show that this authority to interpret was delegated to John Dewenter, the plan administrator appointed by the board. As reflected in Section III, Subsection 4, the Plan does confer the plan administrator with the authority or discretion to decide the factual issues concerning entitlement to benefits. For this reason, the court will review *de novo* the plan administrator's interpretation of the Plan's terms and will review under an abuse of discretion standard the plan administrator's findings underlying the determination that Christie did not timely file her application for benefits. *See Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1557–59 (5th Cir.1991); *Bass v.*

*The Prudential Ins. Co. of Amer.*, No. 89–2356–O, 1991 WL 206243 at 1, 1991 U.S. Dist. LEXIS 14327 at 2 (D.Kan. Sept. 30, 1991); *see generally McGee v. Equicor–Equitable HCA Corp.*, 953 F.2d 1192, 1198 (10th Cir.1992).

## INTERPRETATION OF PLAN

■ The provision at issue is the limitation period found in Section III, subsection 4, which requires an employee to submit the application to the company "within 12 months after the commencement of the disability." The Plan goes on to provide: "A disability shall be deemed to have commenced as of the first day of the continuing absence of the Employee from active employment with an Employer due to such disability."

Plaintiff contends the definition of commencement is ambiguous. She believes the correct interpretation is that an absence from active employment is not due to such disability until a physician finds that a disability exists. (Dk. 36 at 29). In other words, the first day a physician finds a disability to exist is the "first day of continuing absence ... from active employment ... due to such disability." (Dk. 36 at 29).[2] Plaintiff argues this is the only reasonable interpretation, since an employee, like the plaintiff, could be off work for a year or more and not file for benefits believing that he or she would return to work after undergoing rehabilitation. Plaintiff also points to the case of *Bruce v. K–Mart Corp.*, 568 F.Supp. 378, 383 (W.D.Ark.1983), in which the court construing the 1978 version of the Plan held that

an employee should "be considered permanently disabled as of the date when the permanency first became manifest or the date on which the permanency was medically diagnosed with reasonable certainty as having begun." Even though the Plan was amended in 1984 to include a definition on when a disability commences, plaintiff believes the definition in *Bruce* should still be followed. Plaintiff accuses the Company of applying an irrebuttable presumption that the permanent and total disability existed on the first day of plaintiff's continuing absence. Finally, plaintiff argues the provision as interpreted by defendant would produce an inequitable and unreasonable result for she did not know twelve months after her injury that she "was going to be totally and permanently disabled." (Dk. 36 at 38).

Defendant responds that plaintiff's construction would require the court to rewrite the terms of the Plan. The court is unsure how the defendant construes the provision on when a disability will be deemed to commence. The clearest statement of defendant's position is found at page eighteen of its brief, which reads: "3. Employee makes application for disability retirement within 12 months after being continuously absent from work because of the physical disability causing the absence of the Employee from work."

■ Terms in plans are construed without deferring to either party's interpretation and in accordance with established canons of contract interpretation. *McGee*, at 1199. With the goal of giving effect to

---

2. In her reply brief, the plaintiff changes her construction of this sentence:

> The term "such disability" obviously refers to "total and permanent disability," which is the only type of disability addressed in that section of the Plan. If an employee is initially off work due to an injury, but later develops a total and permanent disability, the first day she was absent from work was *not* due to such total and permanent disability, but, instead, was due to the injury.... The only reasonable interpretation of the 12–month limitations period is that the 12 months begin to run from the first day of continuing absence *due to total and permanent disability*, and not from the first day of continuing absence due to an injury or some other cause.

(Dk. 38 at 10–11). Noticeably absent from plaintiff's twenty-one page reply brief is any mention of her original construction of the Plan that an absence is not due to a permanent and total disability until a physician determines the same. Because a party is expected to present her strongest case in the first instance, courts have declined decision on new arguments made for the first time in a reply brief, particularly if involving complicated facts or questions. *Comeau v. Rupp*, 762 F.Supp. 1434, 1451 (D.Kan. 1991); *see Professional Service Industries, Inc. v. Kimbrell*, 766 F.Supp. 1557, 1561 (D.Kan.1991). The plaintiff's new argument will be entertained only because the court believes a final decision on the merits of the plaintiff's claims is proper.

the parties' true intent, a court gives the terms of the Plan the common and ordinary meaning that a reasonable person in the position of an employee would give them. *Id.* at 1201. Stated another way, plans are to be construed according to their plain and ordinary meaning in the absence of an ambiguity. *Bellino v. Schlumberger Technologies, Inc.,* 944 F.2d 26, 29–30 (1st Cir. 1991). The plain meaning of written terms is not to be supplanted with contrary interpretations of the parties. *Id.* at 31–32. Another basic canon is that a term is interpreted in harmony with other terms in the instrument. *Seacat v. Mesa Petroleum Co.,* 561 F.Supp. 98, 105 (D.Kan.1983). The meaning of a contract should not be determined from looking only at a single or isolated provision. *Garvey Center, Inc. v. Food Specialties, Inc.,* 214 Kan. 224, 227, 519 P.2d 646 (1974). Courts are not to rewrite or insert terms that impart an intent for the agreement that was never expressed at the time of execution. *McGee,* 953 F.2d at 1202.

■■■■ The issue of whether a contract is ambiguous is one of law for the court to decide. *Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3rd Cir.1991). An ambiguity exists if a term can be reasonably interpreted in more than one way. The interpretation of an ambiguous term is generally a question of fact decided upon competent evidence concerning the intention of the employer and the beneficiaries, such as past interpretations, past practices, and customary usage. *Taylor,* 933 F.2d at 1232–33. Ambiguous provisions are construed after considering all evidence of facts and circumstances relevant to the parties' intent. *Seacat,* 561 F.Supp. at 105.

The court does not find the relevant terms of Subsection 4 of Section III of the Plan to be ambiguous. The construction proposed by plaintiff in her original brief would require the court to insert terms into the Plan. The only reasonable meaning to paragraph (a) of Subsection 4 of Section III is that an employee is eligible to apply for disability retirement if the application is filed within twelve months from the employee's first day of continuing absence caused by the alleged total and permanent disability.

Paragraph (a) is obviously intended to outline both the procedural and substantive requirements to obtaining disability retirement. It reads:

(a) Any employee covered by the Plan who ceases active employment with an Employer due to a disability which is determined to be total and permanent as provided herein and who, prior to the commencement of the disability, has both attained age 50 and completed 10 years of Service, shall be eligible to make application for a total and permanent disability retirement, provided that such application and medical evidence of total and permanent disability is submitted to the Company within 12 months after the commencement of the disability. A disability shall be deemed to have commenced as of the first day of the continuing absence of the Employee from active employment with an Employer due to such disability. A disability shall be considered total and permanent if a medical examiner satisfactory to the Company certifies that as a result of mental or physical disability such Employee is, and while an Employee became, completely and permanently prevented from engaging in any occupation or employment for wage or profit.

Indeed, the opening sentence sets forth both the critical substantive and procedural requirements. The substantive requirements are described before the proviso, and they are that an employee has reached the age of fifty, has ten years of service, and has a disability which is determined to be total and permanent. After the proviso, the sole procedural requirement is set forth. "[A]n application and medical evidence of total and permanent disability" must be "submitted within 12 months after the commencement of the disability." In much the same way as a statute of limitations, the twelve-month application period reasonably serves the purposes of notice and preservation of evidence concerning the claimed condition.

The Plan specifies that the twelve-month clock begins ticking with the employee's first day of continuing absence "due to such disability." "[S]uch disability" necessarily refers to that condition alleged in the application and upon which medical evidence is submitted. The Plan essentially creates a fact question for the administrator to decide when the employee's absence was first due to the alleged permanent and total disability. A continuing absence can be due to the alleged disability even if the disability is not actually total and permanent and even if a physician has not determined that the disability is total and permanent. The Plan plainly separates the procedural question of when an alleged disability commences from the substantive determination of whether the alleged disability is total and permanent. The Plan simply does not toll the running of the twelve-month period until a physician determines that the employee's disability is permanent and total.

 Plaintiff argues it is inequitable to construe the Plan so as to preclude an employee from recovering disability retirement when she does not file an application within a year of her absence under the belief that physical rehabilitation will still work. It is a basic canon that courts, under the guise of contract construction, are not to rewrite the parties' contract to achieve an equitable result. *Morgan v. Mobil Oil Corp.*, 726 F.2d 1474, 1477 (10th Cir.1984). For this reason, the court will not begin down this dangerous path named "equity" by plaintiff. Since the Plan's terms in this court's judgment are unambiguous, there is also no reason to address certain parol evidence in Dewenter's deposition or the case of *Bruce v. K–Mart Corp.*, 568 F.Supp. 378 (W.D.Ark.1983).[3]

Plaintiff next argues the administrator's interpretation of the twelve-month provision is inconsistent with an interpretation of a defined benefit plan for satisfying the minimum vesting standards of the Internal Revenue Code, 26 U.S.C. § 411(d)(6). For this reason, plaintiff concludes the administrator's interpretation cannot be upheld as it is erroneous on a question of law. Plaintiff cites no authority for the proposition that a court, in a case such as this, should concern itself with whether the administrator's interpretation will affect the tax treatment of the plan under the Internal Revenue Code. Indeed, the administrator in denying the plaintiff's application did not rule as a matter of law that the Plan was qualified under the Internal Revenue Code. Consequently, the administrator's decision on review does not involve this alleged question of law. Even assuming the question was relevant here, the court does not see the twelve-month rule added in 1984 as necessarily reducing or eliminating benefits. Any negative effect on benefits only occurs if an employee fails to comply with the rule.

 Next, the plaintiff accuses the administrator of acting in bad faith. She lists six circumstances which in her opinion show bad faith. Since the court applied a *de novo* interpretation of the Plan, some of the arguments are without any force. Whatever weight these factors may have could influence the court's review of the administrator's factual decision on when the plaintiff's alleged disability commenced. The court will briefly address each of the six grounds. Dewenter's letter of December 17, 1987, can be read to evidence predisposition, but it can also be read to notify the plaintiff of the twelve-month rule that her application would have to overcome. The lack of statistics at K–Mart

---

**3.** Plaintiff's reliance on *Bruce* is misplaced. The court there was concerned with deciding whether the employee had become permanently disabled prior to meeting the ten-year service requirement. The 1978 Plan before the *Bruce* court offered no definition on when a permanent disability commenced for purposes of this requirement. The court looked to insurance law and Social Security law in deciding that an employee is "to be considered permanently dis-

abled as of that date when the permanency first became manifest or the date on which the permanency was medically diagnosed with reasonable certainty as having begun." 568 F.Supp. at 383. First, the issue in *Bruce* is not the issue here. Second, the K–Mart Plan was amended after this decision to define when a disability commences. Third, the court in *Bruce* was never asked to apply the first day of absence rule in regards to the twelve-month application period.

on application denials and the reasons behind them is tenuous evidence of bad faith and so is the fact that the Plan would gain from a denial of benefits. The lack of evidence on whether the administrator has uniformly interpreted the Plan is irrelevant as the court has reviewed *de novo* his interpretation and found the term unambiguous. Adding in later review letters another reason to bolster a denial of benefits may violate ERISA regulations, but it does not necessarily indicate bad faith. The additional reason, lack of medical information, is not inconsistent with the twelve-month rule reason for denying benefits. The application of the twelve-month rule does not presume a total and permanent disability, since it operates from the commencement of the claimed permanent and total disability. Finally, the court sees no bad faith in amending a plan so as to avoid future litigation. The combined weight of these circumstances falls far short of a *prima facie* case showing the defendant acted in bad faith.

### ERISA VIOLATIONS

Plaintiff here contends that the summary plan description makes no mention of the twelve-month limitation and, therefore, conflicts with the Plan itself. Plaintiff then calls upon the general rule that a summary plan description will govern where it conflicts with a plan. The court finds no merit to this argument.

At the conclusion of the so-called summary plan description or general outline in the Booklet appears the following in large, bolded type:

**Note: The preceding is intended only as a general outline of the major features of the K Mart Employees' Retirement Pension Plan and not as complete description of the Plan. Should there be any discrepancy between the preceding general outline and the actual provisions of the Plan, the latter will govern.**

Therefore, even assuming a conflict between the general outline and the Plan, the terms of the Plan will control by operation of the disclaimer in the outline. *See McGee,* at 1201. Moreover, a full reading

of the general outline, including the references to the Plan, would disclose the twelve-month application period. The general outline concludes the discussion of total and permanent disability retirement with a reference to Section IV, subsection 4 of the Plan. This term of the Plan begins: "An Employee who before Normal Retirement Date is retired for total and permanent disability pursuant to subsection 4 of Section III shall receive...." Section III, subsection 4 specifies the twelve-month application period. At page ten of the general outline, the general application requirement is mentioned. In light of the disclaimer and the reasonable references leading to the twelve-month application period, the court is convinced the specific omission of the twelve-month application period from the summary did not prejudice the plaintiff so as to justify applying the conflict rule advocated by plaintiff. In fact, the plaintiff has not offered any evidence showing she relied on the general outline to her detriment. The cases cited by plaintiff for the conflict rule are distinguishable or questionable authority. *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988) (Plaintiff only received the summary and detrimentally relied upon it); *Genter v. Acme Scale & Supply Co.,* 776 F.2d 1180, 1183 (3rd Cir.1985) (Circuit court presumed reliance as the plan employee was deceased); *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1571 (11th Cir.1985) (Circuit court found the plaintiff had justifiably relied on the summary).

Plaintiff also argues the defendant violated ERISA requirements at 29 U.S.C. § 1022 for not disclosing in the so-called summary plan description the twelve-month application period and the procedure for submitting an application along with medical certification. Beyond alleging the violations, plaintiff does not explain what relief, if any, should be granted as a result. The general rule on the remedies available for technical violations of ERISA appears to be as follow:

[P]rocedural violations of ERISA entitle employees to monetary relief only in ex-

ceptional cases. *See Berger v. Edgewater Steel Co.*, 911 F.2d 911, 920–21 (3d Cir.1990); *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388, 393 (7th Cir.1983). Most courts that have considered the issue have held that the employer must have acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary before recovery for procedural violations is warranted. *See Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (active concealment); *Govoni v. Bricklayers, Masons & Plasterers*, 732 F.2d 250, 252 (1st Cir.1984 (collecting cases requiring reliance and prejudice).

*Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739 (7th Cir.1991). *See also Veilleux v. Atochem North America, Inc.*, 929 F.2d 74, 76 (2nd Cir.1991) (disclosure violations must cause a "substantive harm" such that they taint the denial of benefit decision); *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1319 (3rd Cir.) (reporting and disclosure violations are irrelevant in determining entitlement to benefits), *cert. denied*, —— U.S. ——, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). Plaintiff has not come forth with any facts in her motion or supporting memorandum showing reliance or prejudice from the alleged disclosure violations. The terms of the Plan were not concealed from plaintiff. The plaintiff's tenuous allegations of bad faith are an insufficient reason for awarding monetary relief to plaintiff. Having presented no evidence to support any relief upon these alleged violations, the plaintiff cannot prevail on these claims.[4]

Plaintiff's next enumerated issue is that the administrator failed to give proper notice of the denial decision so plaintiff could present the necessary evidence of her disability. This issue principally addresses the plan administrator's addition of another reason for denying benefits in the final review letter. Plaintiff alleges this action violates several ERISA violations. The

court need not consider these arguments, since the administrator's denial of benefits can be upheld on the ground that plaintiff's application was untimely.

## SUBSTANTIAL EVIDENCE

■ The court must now decide whether the plan administrator's reason for denying benefits, the untimeliness of plaintiff's application, is so insufficient or unreasonable as to be arbitrary and capricious. *See Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1457 (10th Cir.1991). Plaintiff asserts the decision is not supported by substantial evidence. The Tenth Circuit recently summarized the court's task in conducting this review:

> In determining whether the decision was supported by substantial evidence, we consider only the facts before the Administrators at the time of their decision. (Citations omitted). The Administrators' decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within their knowledge to counter a claim that it was arbitrary or capricious. (Citations omitted). "We will not substitute our judgment for the judgment of the [Administrators] unless 'the actions of the [Administrators] are not grounded on *any* reasonable basis.'" *Oster v. Barco of Cal. Employees' Retirement Plan*, 869 F.2d [1215] at 1218 [9th Cir. 1988] (emphasis in original) (quoting *Elser v. I.A.M. Nat'l Pension Fund*, 684 F.2d 648, 656 (9th Cir.1982)).

The court finds substantial evidence for the plan administrator's finding that the plaintiff failed to file her application within twelve months of her first day of continuing absence due to the claimed permanent and total disability.

On her application, plaintiff filled in the blank after "Date Disability began" with "Temporary disability began July, 1986." In the subsequent blank after "Nature of disability", plaintiff wrote: "Became permanent total disability according to Dr.

---

**4.** The pretrial order does not include any claim against the plan administrator for the relief

provided in 29 U.S.C. § 1132(c) for these alleged disclosure violations.

Jackson and Dr. Wertzberger in June, 1987 due to back pain and leg pain. Enclosed: Reports of Dr. Wertzberger 6–9–87 and 9–1–87. Report of Dr. Jackson 12–10–86." Reading these statements together, the plaintiff essentially alleges her permanent and total disability began in June of 1987. In plaintiff's view, her continuing absence was not due to her permanent and total disability until then. Her medical evidence submitted with the application does not support her allegation.

Dr. Wertzberger's letter of June 9, 1987, states that plaintiff is continuing her therapy but making "slow improvement." It goes on to say that the physician does not believe the plaintiff will work again for K–Mart but that another six weeks of therapy was prescribed. In his letter dated September 1, 1987, Dr. Wertzberger opined that plaintiff's condition had "reached maximum medical improvement." Dr. Jackson's letter of December 10, 1986, offers a few more details. He noted that x-rays showed changes associated with a degenerative disc disease. The plaintiff has had persistent pain since June of 1986 and it has remained about the same for that period. Dr. Jackson's opinion was that her pain and weaknesses in the back were mostly attributable to the aging process.

Nothing in these letters, the other letters of Dr. Wertzberger, Dr. Jackson or Rita Hoffman, R.P.T., the affidavits of Dr. Wertzberger and Rita Hoffman suggests that as of August 15, 1986, the plaintiff's alleged condition was less disabling or severe than it was in June of 1987. If anything, the records suggest some medical improvement. The records here show that the negative change in prognosis was not due to a deterioration in actual physical condition but was caused by the lack of improvement in therapy. Consequently, the plan administrator reasonably found that the plaintiff's absence on August 15, 1986, was due to her alleged permanent and total disability, because there was no medical evidence to show a decline or deterioration in her condition after that date. The only thing that did change by June of 1987 was the prospect that plaintiff could improve with therapy to the point of returning to work for K–Mart. Substantial evidence supports the plan administrator's conclusion that plaintiff did not file her application within twelve months of her first day of continuing absence caused by her alleged permanent and total disability.

Plaintiff has filed a renewed motion to compel discovery and for sanctions. (Dk. 33). The plaintiff does not argue in her motion for summary judgment or in her response to defendant's cross-motion for summary judgment that discovery at issue in her motion to compel is relevant to the summary judgment proceedings. For this reason, it is unnecessary at this juncture to decide the motion to compel. As to the request for sanctions, the court will not take up that matter unless the plaintiff renews her motion for sanctions within 15 days of the filing date of this order.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment (Dk. 35) is denied;

IT IS FURTHER ORDERED that defendant's cross-motion for summary judgment (Dk. 37) is granted.